UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re: ALSON ALSTON          :
                             :    Case No. 18-16008
          Debtor             :    Chapter 11

# ALSON ALSTON'S DISCLOSURE STATEMENT
# AND PLAN OF REORGANIZATION
# DATED DECEMBER 3, 2018

## Table of Contents

| Section | Page |
|---|---|
| I. Introduction | 2 |
| II. Background | 3 |
| III. Summary of the Plan of Reorganization and Treatment of Claims and Equity Interests | 11 |
| IV. Confirmation Requirements and Procedures | 16 |
| V. Effect of Confirmation of Plan | 19 |
| VI. Other Plan Provisions | 20 |
| **Separate documents ...** | |
| Plan of Reorganization | |
| Exhibit A: Supporting Documents | |
| Exhibit B: Asset Valuations | |
| Exhibit C: Summary of Estate Income and Expenses | |
| Exhibit D: Plan Implementation Summary and Details | |
| Exhibit E: Liquidation Analysis | |
| Exhibit F: Unsecured Debt and Income Tax Liabilities | |
| Exhibit G: Pre-petition Financial Statements | |
| Exhibit H: Recent Monthly Operating Reports | |
| Exhibit I: Relevant Affidavits | |

## DISCLOSURE STATEMENT

## I. INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the Chapter 11 case of Alson Alston (the "Debtor"). This Disclosure Statement contains information about the Debtor and describes Alson Alston's Plan of Reorganization (the "Plan"), dated December 3, 2018. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The proposed distributions under the Plan are discussed at pages 7-13 of this Disclosure Statement. Most secured creditors will receive their contract payments for the duration of the Plan, while Debtor seeks to modify the terms of others, as permitted by the relevant statutes. General unsecured creditors are classified in Class 10, and will receive a distribution of between 35% and 55% of their allowed claims, depending on which disputed claims are denied, if any.

The Plan is fully funded by the current rental income of the estate and the new income that Debtor's significant investment in the estate will begin yielding over the next days, weeks and months. Below are before-and-after images of the renovations which Debtor is overseeing in 2834 and 2836-38 W. Girard Avenue, Philadelphia.



| Before @ 2834 & 2836-38 W. Girard Ave., Phila. | After @ 2834 & 2836-38 W. Girard Ave., Phila. |

### A. Purpose of This Document
This Disclosure Statement describes:
- The Debtor and significant events during the bankruptcy case;
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed);

- Who can vote on or object to the Plan;
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
- Why Debtor Alston believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

## B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

*1. Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will take place on _____, at _____, at the United States Bankruptcy Court - E.D. PA., Courtroom Number 1, Third Floor, The Madison, 400 Washington Street, Reading, Pennsylvania 19601.

*2. Deadline for Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to:
Alson Alston
2836 W. Girard Avenue
Philadelphia, PA 19130

See section IV.A below for a discussion of voting eligibility requirements.

Your ballot must be received by _____ or it will not be counted.

*3. Deadline for Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon all parties of interest.

*4. Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact:
Alson Alston
2836 W. Girard Avenue
Philadelphia, PA 19130

## C. Disclaimer

3

***The Court has [conditionally] approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. [The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan. Objections to the adequacy of this Disclosure Statement may be filed until _____.]***

You will be notified of the hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan.

## II. BACKGROUND

### A. Description and History of the Debtor's Business

Alson Alston is an individual who purchased various parcels of commercial or mixed-use (commercial and residential) real estate (each, a "**Property**" and collectively, the "**Properties**") as a profit-making venture. In addition, Alston operated several businesses at several of those Properties.

### B. Insiders of the Debtor

There are no insiders in Debtor's business, other than Debtor.

### C. Management of the Debtor's Business before and during the Bankruptcy

Alston has employed dozens of individuals in his various businesses, hired lawyers, accounts and property managers, and contracted with scores of tradesmen to renovate and maintain his properties. Alston now manages all of the Properties. By the sixth month of the Plan, Alston will deed to the mortgagee or sell 3033 Baltz Street, to reduce the expense burden on the estate. All other properties are essential to the estate, but Alston may sell one or more of them if such sales would be required to add sufficient revenue to compensate for rental shortfalls or payoff the Plan substantially faster than the five years incorporated into the Plan. A description of each property and its relevant disposition are captured in footnote form, for convenience.[1]

---

[1] A brief description and history of each Property follows.
1. 2836-38 W. Girard Avenue has been the Debtor's primary business location and office for 18 years and will become the primary site for the shared office space rentals he will begin offering shortly. This repurposing of 2836-38 and 2834 W. Girard (see below) will produce revenues in excess of the remainder of the estate.
2. 2834 W. Girard Avenue has two fully rented efficiency apartments in fair condition. Debtor is in the midst of renovating the office areas of the remainder of the building so that they contain higher-end shared office space rentals, with the option of leasing each of the four-six offices as private, standard commercial spaces. Alston has obtained value estimates for this property once the renovations are complete and proposes to sell this building, if necessary to fund the Plan.
3. 2827 W. Girard Avenue has received extensive upgrades over the past 16 months so should be considered in fair-to-good condition. It contains a storefront and two apartments.
4. 4904 Monument Road has been the residence of Alston's elderly and disabled relatives for 17 years; the building is in fair condition. His relatives pay for all utility and maintenance. Due to renovations in recent years, creating two separate wheelchair-friendly spaces, Alston is in a position to lease one of the spaces. He reserves this option as a

**D. Events Leading to Chapter 11 Filing**

A combination of factors outlined herein, including a declining real estate market, the poor initial condition of several of the Properties that limited their revenue-producing potential, high contract interest rates arising from predatory lending practices of his creditors, and business decisions by the Debtor with unanticipated consequences, resulted in the Debtor's inability to remain current in mortgage payments on the Properties and payments to suppliers of goods and services. Alston initially filed for Chapter 11 protection just prior to attending law school at the University of Florida in 2012. He had negotiated impairments to the debts of several secured creditors and submitted what he anticipated to be his final Disclosure Statement and plan on the eve of a hearing. His attorney never informed him that his attendance was mandatory. At the hearing, UST David P. Adams objected to the introduction of Alston's hard-won Disclosure Statement and Plan on hearsay grounds. The court agreed and dismissed the petition. Alston's lawyer never returned any communications sent by Mr. Alston from that point forward.

Unable to resolve his financial matters during his first two years of law school, Alston filed for Chapter 11 protection again on July 28, 2014, just prior to his third year. He worked for Uber and Lyft, but his rental income was strong enough to support a feasible plan. Unfortunately, after two years of fighting increasingly aggressive corporate attorneys representing his mortgagees and numerous misunderstandings of record by that Court about what Alston included in his Disclosure Statements and Plans – which are at the root of the appeal of that action currently in the Third Circuit – that Court dismissed Alston's second petition.

Alston immediately began liquidating his most valuable and significant real property. He reinvested the proceeds into his real estate and paying off all taxing authorities. He also started an LLC to operate his new software development company. That venture produced two sophisticated products that have yet to earn any income, but the LLC is producing consulting revenue. He has scaled back operations so that he does not have to contribute further investments to it. By Court order of October 11, 2018, Alston has pulled that and all other LLCs from these proceedings. He will refile his schedules and other documents on or about December 17, 2018 to reflect the completion of that process. Just prior to filing the instant petition and before selling a third property, Alston filed for a Chapter 13, but learned, through a careful calculation of his debt, that he was just over the statutory limits. He was grimly certain that he could not propose a feasible Chapter 11 plan at the time, so petitioned this Court for a dismissal, which it granted.

---

        means to meet Plan expenses should other income prove elusive. No part of this Statement or Plan is dependent upon such a rental, however.

5. Alston renovated 3033 Baltz Street in or about 2007, but after prolonged evictions of tenants who nearly destroyed the building, it is now in very poor condition. It will be sold or deeded to mortgagor in first year of Plan.
6. Alston has rented the first and second floors of 2825 W. Girard Avenue to a restaurant and its owner. A three BR unit is being renovated, but will not contribute immediately to the cash flow of the estate. No part of this Statement or Plan is dependent upon such a rental.

5

Alston commenced the current proceedings to allow him to reorganize his estate, including 2836-38 w. Girard Avenue, Philadelphia, PA 19130 ("2836"). The various mortgagees for 2836 have continually refused to negotiate an amicable settlement over the past ten years, preferring, perplexingly, to attempt to sell the property at sheriff's sales for less than the cash offers Alston has made. In the associated foreclosure proceeding for 2836, a state court found that the original lender engaged in fraudulent misrepresentation at the origination of the loan. (Ex. A.) However, that court reversed itself on a new theory under the PA Uniform Commercial Code, granting judgment in favor of AS Peleus, since succeeded by Citibank as Trustee. This history is important because it allows the reader to understand that Alston's character is not at issue with respect to this holdout creditor.

That property, 2836 W. Girard, is essential to the well-being of Alston, his family and the employees of his real estate business. As this Disclosure Statement demonstrates, only the inclusion of 2836 W. Girard in his Plan permits the reorganization to be successful.

### E. Significant Events during the Bankruptcy Case

As set forth in detail both above and in the Plan, as of the Petition Date, the Debtor is indebted to the secured creditors in the amount of approximately $1.5 million; to unsecured creditors in the amount of $564,207 (including $266,415 of unsecured debt from secured mortgages, pursuant to Section 506(a)(1) of the Code, though this amount could be as high as $454,681 (should Citibank's disputed claim be upheld); to taxing authorities for priority taxes in the disputed amount of $8,326.00; to taxing authorities for unsecured taxes in the disputed amount of $47,425, should the disputed IRS claim be upheld and as low as $0 otherwise; to other taxing authorities in the secured, disputed amount of $68,864, should all such disputed claims be upheld. The Debtor is current on three mortgages, insurance, real estate taxes and his utility payments, but not the mortgages for 3033 Baltz St. (which he intends to surrender to the mortgagee) and for 2836-38 W. Girard Ave., which he is working tirelessly to retain in the estate as an essential component. The Plan demonstrates how revenue of the estate can satisfy the Debtor's obligations to all creditors, per the Code.

The Debtor has invested nearly half of the estate's cash reserves into renovations of 2834 and 2836 W. Girard so that they can generate substantially more revenue. To that end, he has nearly completed upgrading two offices at 2834 and will complete upgrading two additional ones within 30 days. Similarly, he has made significant improvements to 2836. In both cases, Alston will offer the rentals as parts of a shared office space – a strategy that is producing significant profits across Philadelphia and the nation – but will also offer the rentals as traditional, private offices, as necessary. **Ex. A will contain relevant information about the rentals, upgrades, floor plans, marketing, partners and leasing progress. Debtor will file supplements to this Exhibit periodically, intended to support this Disclosure Statement, in lieu of amending the Disclosure Statement.**

The Debtor is optimistic about his long-term economic prospects because there is sufficient, stable, proven, reliable, current and near-term income and income-generation capacity in the estate to service allowed secured debt, administrative claims, priority claims, other allowed debt, and any approved portion of general unsecured debt. The Plan ensures the stability of the estate, is feasible, and is fair and equitable to unsecured creditors.

**F. Projected Recovery of Avoidable Transfers**

The Debtor has not yet completed its investigation with regard to pre-petition transactions. If you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtor may seek to avoid such transfer.

**G. Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

**H. Historical and Current Financial Conditions**

The monthly indebtedness of the prepetition estate is as follows – there was a net negative of ($3,965) in the rental operations, when required mortgage payments for all creditors were included in the cash-flow analysis:

Table 1. Pre-Petition Rental Cash Flow.

| Address | Rents | Mortg Exp. (P+I) | RE Taxes (if not escrowed) | Insurance (if not escrowed) | Utilities & Other Exp |
|---|---|---|---|---|---|
| 2825 W. Girard Ave., Phila.[2] | $2,050 | $850 | $0 | $350 | $50 |
| 2827 W. Girard Ave., Phila. | $3,250 | $0 | $268 | $350 | $75 |
| 2834 W. Girard Ave., Phila.[3] | $1,115 | $1,853 | $0 | $0 | $100 |
| 4904 Monument Rd., Phila. | 0 | $1,370 | $0 | $0 | $75 |
| 3033 Baltz St., Phila.[5] | 0 | $1,100 | $51 | $61 | $50 |
| 2836 W. Girard Ave., Phila.[6] | 0 | $3,000 | $327 | $350 | $100 |
| **TOTALS** | **$6,415** | **$8,173** | **$646** | **$1,111** | **$450** |
| *Net Income(Rent-Mortg-Exps)* | ($3,965) | | | | |

The identity and fair market value of the estate's real property assets are listed below, based on appraisals, competitive market analyses ("CMAs"), commercial databases, settlements, and real estate trends. In some cases, Alston relies upon his extensive knowledge of real estate – he has been a real estate professional, per IRS definitions (not a licensed agent or broker), for approximately twenty-five years.

Table 2. Pre-Petition Valuations of Bankruptcy Estate Real Properties.

| Address | Value (from Schedules) | Loan Principal as per Judgment or Mortgage | Section 506(a)(1) Secured & Unsecured Amts | Creditor's Claim |
|---|---|---|---|---|
| 2825 W. Girard Ave., Phila. | $286,400 | $155,000 from mortgage | $155,000 secured $0 unsecured | |
| 2827 W. Girard Ave., Phila. | $311,800 | | | |
| 2834 W. Girard Ave., Phila. | $240,700 | $201,000 from mortgage | $201,000 secured $0 unsecured | |
| 4904 Monument Rd., Phila. | $184,649 | $217,000 from mortgage | $184,649 secured $32,351 unsecured | |
| 3033 Baltz St., Phila. | $170,161 | $150,000 from mortgage | | |
| 2836-38 W. Girard Ave., Phila. | $303,025 | $537,089 from Judgment | $303,025 secured $234,064 unsecured | $725,354 |
| **TOTALS** | **$1,496,735** | **$1,125,089** | **$843,674 secured $266,415 unsecured** | |

8

The Debtor's unsecured debt is as follows:

Table 3. Pre-Petition Unsecured Debt.

| Type | Amount based on Schedules | Amount based on Citibank's Claim* |
|---|---|---|
| Section 506 unsecured bifurcation (disputed) | $266,415 | $454,681 |
| IRS (disputed) | $47,425 | $47,425 |
| Student Loans | $238,864 | $238,864 |
| PECO | $2,102 | $2,102 |
| Other | $9,401 | $9,401 |
| **TOTAL:** | $564,207 | $752,473 |

*Should Citibank As Trustee's claim for $725,354 with respect to 2836 W. Girard be upheld, then the Section 506 bifurcation for 2836 would be $422,329 (=$725,354 - $303,025). The unsecured amount for 4904 Monument Road is also included at $32,351.

The Debtor's most recent financial statement, in the form of schedules reflecting pre-petition debt, and his most recent post-petition monthly operating reports ("MOR"), each of which was filed with the Court, will be set forth in Exhibit G. These statements may be updated, as conditions warrant, and filed as a supplement to this Disclosure Statement – *without* filing an amended Disclosure Statement.

There are two important observations to make regarding these reports. First, per the Court's Order of October 11, 2018, Debtor is separating all of his LLCs and their assets & liabilities from these proceedings. This process is nearly complete, but it means that any one bank account statement may reflect transactions for both business activities in Alston's name as well as for his LLCs. Second, the process of separating his LLCs from the instant matter is a manual and laborious one because Alston had deliberately merged his business interests in anticipation of transferring all assets to his LLCs. Identifying and segregating past and current transactions resulted in the first three MORs, as preliminary versions. As disclosed in those reports, Alston calculates the cash reserves of the bankruptcy estate as:

Table 4. Liquid Assets for Debtor as Individual (Includes Real Estate).

| Assets on Petition Date (9/11/2018) | | Assets on 9/30/2018 | | Assets on 10/31/2018 |
|---|---|---|---|---|
| Bank Accounts | $75,000.00 | | $66,429.00 | $42,960.00 |
| Cash | $780.00 | | $360.00 | $250.00 |
| Cashier's Chk ($60K)* | $60,000.00 | | $60,000.00 | $60,000.00 |
| Settlement** | $0.00 | | $0.00 | $50,000.00 |

9

| Totals | $135,780.00 | | $126,789.00 | | $153,210.00 |
|---|---|---|---|---|---|
| | | | | | |
| Retirement Accounts | $6,501.39 | | $6,501.47 | | $6,501.68 |

** The personal injury case which Debtor previously disclosed in his schedules settled on 10/31/2018. Alston only estimates his portion of the settlement. It is unclear when the funds will be disbursed.

Since the Plan calls for significantly upgraded rental units to maximize estate revenue, Alston has been spending nearly half of the estate's cash reserves on renovations and improvements. Many of the interim results will be captured in Exhibit A. Alston will periodically update this exhibit to support this Disclosure Statement, without filing an amended Disclosure Statement.

In his Plan, Alston provides projections of the income and expenses to be derived from the new renovations and cramdowns which he proposes. He conservatively calculates that the estate will go from heavy monthly pre-petition losses to a healthy and stable net positive, as described in the table below.

**Table 5. Plan Will Produce Significant Improvements in Financials of the Estate.**

| Period | Monthly Net Income from Rentals |
|---|---|
| Pre-Petition | ($3,965) |
| Year #1 of Plan | $36 |
| Years #2-5 of Plan | $2,289 |

Debtor's financial picture post-petition has clearly been dominated by his extensive renovations to the estate real properties. After twenty-five years buying, selling and managing real estate, Alston has finally had sufficient resources (gained through sales of other real estate) to make the kinds of improvements to estate properties that will increase rental income significantly and easily support all of the debt of the estate.

# III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

**In the Plan and this Disclosure Statement, the amounts indicated as being paid to the creditors in each phase are not projections, they are commitments under the Plan. The amounts indicated will be increased only by Court order. The amounts indicated for a specific creditor will be decreased only by agreement with that creditor or by Court order; if payments to creditors with unclassified claims or creditors in Classes 1-9 are so reduced, the amount of the reduction will be distributed to the Class 10 creditors in a pro rata manner. With the last payment of the Plan, any undistributed funds available for creditors will be distributed to Class 10 creditors and to student loan processors.**

### B. Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has not placed the following claims in any class:

*1. Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

Debtor will not have administrative expenses because he has generally been and will continue to pay all administrative expenses when due, certainly well before the effective date of the Plan.

*2. Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

Priority Claims by Taxing Entities

| | Creditor | Claim Amount |
|---|---|---|
| | City of Philadelphia* | $7,939 |
| | **TOTALS** | **$7,939** |

## C. Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan.

### 1. Classes of Secured Claims

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

| Class | Impairment | Treatment |
|---|---|---|
| Class 2 – Secured Claim of Shell Point Mortgage Services | Unimpaired | 1. Secured Claim UNIMPAIRED, Shell Point Mortgage Services<br>2. Re: 2825 w. Girard Avenue, Philadelphia, PA.<br>3. **PRE-PETITION**:<br>   a. Debtor is current on all payments.<br>   b. Principal: $155,000, Interest: 3.875%, Maturity: 3/1/2036, Monthly Payment: $850<br>4. **IN PLAN** – Debtor will pay as per the terms of the note.<br>   a. Approximate amount allowed: $155,000. Unsecured claim under § 506 of the Code: $0.<br>   b. Total Plan payments: $51,000. |
| Class 3 – Secured Claim of Bayview LS | Impaired | 5. Secured Claim <u>Impaired</u>, as to Interest and Term (NOT Principal), Bayview Loan Servicing,<br>6. Re: 2834 W. Girard Avenue, Philadelphia, PA.<br>7. **PRE-PETITION**:<br>   a. Debtor is current on all payments.<br>   b. Principal: $201,000, Interest: 5%, Maturity: 12/1/2034. Monthly Payment: $1,853.<br>8. **IN PLAN** – Debtor will seek cramdown.<br>   a. Approximate amount allowed: $201,000. Unsecured claim under § 506 of the Code: $0.<br>   b. To be amortized over 30 years at 5%.<br>   c. Pay first 5 years in Plan and refinance **with a different lender**, the remaining 25 years after discharge or refinance.<br>   d. New Principal: $201,000, Interest: 5%, Maturity: 2049. Monthly Payment: $1,079.<br>   e. Total Plan payments: $64,740. |
| Class 4– Secured Claim of Ocwen for Deutsche Bank | Unimpaired | 9. Secured Claim UNIMPAIRED, Ocwen for Deutsche Bank<br>10. Re: 4904 Monument Road, Philadelphia, PA.<br>11. **PRE-PETITION**:<br>   a. Debtor is current on all payments.<br>   b. Principal: $217,000, Interest: , Maturity: . Monthly Payment: $1,370<br>12. **IN PLAN** – Debtor will pay as per the terms of the note.<br>   a. Approximate amount allowed: $184,649. Unsecured claim under § 506 of the Code: $32,351.<br>   b. Total Plan payments: $82,200. |

| | | |
|---|---|---|
| Class 5 – Secured Claim of Ocwen for Wells Fargo | Impaired | 13. Secured Claim <u>Impaired</u>, as to Interest, Principal and Term, Ocwen for Wells Fargo.<br>14. Re: 3033 Baltz Street, Philadelphia, PA.<br>15. **PRE-PETITION**:<br>    a. Debtor is in default for approximately $50,000.<br>    b. Approx. Principal: $100,000, Interest: , Maturity: 2036. Monthly Payment: $1,100.<br>16. **IN PLAN** – No contribution to the estate. During the first six months of the Plan, Debtor will seek approval to sell or deed back to mortgagee. |
| Class 6 – Secured Claim of Disputed Mortgage for 2836 W. Girard Ave. | Impaired | 17. Secured Claim <u>Impaired</u>, as to Principal, Interest and Term, Fay Servicing Corporation for Citibank,<br>18. Re: 2836-38 W. Girard Avenue, Philadelphia, PA.<br>19. **PRE-PETITION**:<br>    a. Debtor is in default for approximately $380,000.<br>    b. Judgment for: $537,089. Approx. Principal: $350,000, Interest: 8%, Maturity: 2028. Monthly Payment: $3,000.<br>20. **IN PLAN** – Debtor will seek cramdown.<br>    a. Approximate amount allowed: $303,025. Unsecured claim under § 506 of the Code: $234,064.<br>    b. To be amortized over 30 years at 5%.<br>    c. Pay first 5 years in Plan and refinance **with a different lender**, the remaining 25 years after discharge or refinance.<br>    d. New Principal: $303,025, Interest: 5%, Maturity: 2049. Monthly Payment: $1,627.<br>    e. Total Plan payments: $97,620. |
| Class 7 – Secured Claim of IRS | Unimpaired | Secured Claim UNIMPAIRED, IRS. Approximate amount allowed: $47,425. Total Plan payments: $47,425. (Disputed) |
| Class 8 – Secured Claim of City of Phila. | Impaired | Secured Claim <u>Impaired</u>, City of Phila. Amount allowed: $64,691, including statutory interest. Total Plan payments: $64,691. (Disputed) |
| Class 9 – Secured Claim of Other Taxing Authorities TBD | Unimpaired | Secured Claim UNIMPAIRED, Other Taxing Authorities TBD. Amount allowed: $TBD, including statutory interest. Total Plan payments: $TBD. |

<u>Secured Claims by Taxing Entities</u>

| CLS | Creditor | Claim Amount |
|---|---|---|
| 7. | IRS* | $4,173 |
| 8. | City of Philadelphia | $64,691 |
| | **TOTALS** | **$68,864** |

As demonstrated below, payments to secured creditors who are note holders begins in month #1, Phase I of the Plan; payments to secured creditors who are taxing authorities begin in Phase II of the Plan, month #13.

*2. Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the

13

effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment. There are no such classes in the Plan.

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - Priority Claims | Unimpaired | Class 1 is unimpaired by this Plan, and each holder of a Class 1 Priority Claim will be paid in full, scheduled throughout the duration of the plan, beginning with the later of the effective date of this Plan as defined in Article VII, or the date on which such claim is allowed by a final nonappealable order, with the balance of payments owed after discharge to be paid according to mutually agreed upon schedules. Approximate amount allowed: Still being determined, none by present analysis. |

### 3. Class[es] of Unsecured Claims

Unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code. These debts total approximately $564,207. This includes $266,415 of unsecured debt from secured mortgages, pursuant to Section 506(a)(1) of the Code, though this amount could be as high as $454,681 (should Citibank's disputed claim be upheld). Debtor is indebted to taxing authorities for priority taxes in the amount of $8,326.00, should the disputed amount be upheld; to taxing authorities for unsecured taxes in the amount of $47,425, should the disputed IRS claim be upheld and as low as $0 otherwise; to taxing authorities in the secured amount of $68,864, should all disputed claims be upheld. As demonstrated below, payments to unsecured creditors begin in Phase II of the Plan, Month #13. Student loans are incorporated into in Class 10.

| Class | Impairment | Treatment |
|---|---|---|
| Class 10 – General Unsecured Creditors | Impaired | General unsecured claims allowed under § 502 of the Code. Approximate amount allowed: $564,207 (including $266,415 of unsecured debt from secured mortgages, pursuant to Section 506(a)(1) of the Code, though this amount could be as high as $454,681 (should Citibank's disputed claim be upheld); to taxing authorities for priority taxes in the amount of $8,326.00; to taxing authorities for unsecured taxes in the amount of $47,425, should the disputed IRS claim be upheld and as low as $0 otherwise; to taxing authorities in the secured amount of $68,864, should all disputed claims be upheld. Total Plan payments: between $200,000 and $309,879 (35-55 cents on the dollar). |

Unsecured Non-Priority Claims by Taxing Entities

|   | Creditor | Claim Amount |
|---|---|---|
| 1. | IRS | $47,425 |
|   | **TOTALS** | **$47,425** |

### D. Means of Implementing the Plan

#### 1. Source of Payments

Payments and distributions under the Plan will be funded through Alston's continued operation of his rental properties, including the shared office space offerings. The Plan contains the all income and expenses throughout Plan.

*Phase I – First 12 Months of Plan*

During the first 12 months of the Plan, Debtor will make all crammed down and contract-specified payments to secured creditors and pay administrative fees, **but no other debts**. He will draw a salary from the estate of $4,885/mo after taxes. He will continue to advertise and build out the shared office space rentals at 2834 and 2836-38 W. Girard Ave. He will make $61,709 in Plan payments. Alston will sell 3033 Baltz St. or deed back to mortgagee.

*Phase II – Months 13 and Beyond of Plan*

During the period beginning Month 13 of the Plan, Debtor will make principal and interest payments on all mortgages, as well as all other debts due under the Plan. He will make $529,224 in Plan payments. During this phase, Alston expects to close the instant case and reopen just prior to discharge, saving UST fees. Additionally, during this Phase, he will market for possible sale both or either 2825 and 2834 W. Girard Ave., should his rental projections prove unsatisfactory, though sales of these properties will harm future prospects for the estate and Alston's family.

*2. Post-confirmation Management*

The Post-Confirmation Managers of the Debtor, and their compensation, shall be Alston at approximately 20% of the rents received per month (after wage taxes). This is already incorporated into the Plan calculations. Alston is entitled to this amount because he acts, on a full-time basis, as property manager and strategic planner, which will require significant portions of his time and for which he must be properly compensated; as well, he has invested several hundred thousand dollars in the estate properties, so is entitled to a reasonable return on his investment. He will hire appropriate individuals to assist with property management, as necessary.

After confirmation and within thirty days after the end of each calendar quarter that this case is open, the reorganized Debtor shall file with the court and serve on the UST a quarterly financial report for each calendar quarter (or portion thereof) during which the case remains open, in a format prescribed by the UST and provided to the Debtor by the UST.

**E. Risk Factors**

The proposed Plan has the following risks:
- The real estate rental market could collapse.
  - This appears unlikely, based on current upward trends locally and nationally.
  - If the market does collapse, Alston will rely upon liquidation to payoff the remainder of the Plan.

**F. Executory Contracts and Unexpired Leases**

The Plan lists all executory contracts and unexpired leases that the Debtor will assume under the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. The Plan also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your

15

objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in the Plan will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases. If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

***The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is _____.***

Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### G. Tax Consequences of Plan

The following are the anticipated tax consequences of the Plan:

- Debtor: Any debt discharged will be done to the extent that Debtor is insolvent, so Debtor will not experience additional taxes as a result.
- Creditors: Creditors are encouraged to consult tax professionals to determine the tax consequences of the Plan. Debtor is not qualified to make statements on that matter.

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code, subject to the reinstatement provisions of §1124(2), if applicable. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 3, 5, 6, 8 and 10 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes 2, 4, 7 and 9 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

16

*1. What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case is _____. (Debtor has not yet filed a motion to set the Claims Bar Date.)***

*2. What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

*3. Who Is **Not** Entitled to Vote*

The holders of the following six types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;
- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;
- holders of claims or equity interests in unimpaired classes;
- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;
- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and
- holders of administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

*4. Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**B. Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section B.2.

*1. Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

*2. Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cramdown" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

**C. Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. A liquidation analysis will be attached to this Disclosure Statement as Exhibit E. As is evident from the analysis, unsecured creditors, including priority tax creditors, would get significantly less under a Chapter 7 proceeding, while secured creditors would receive only a portion of their claim. Hence, the creditors are far better served by adopting the Plan, rather than seeking to liquidate the estate.

**D. Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

*1. Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan, on or about February 1 or March 1, 2019, to pay all the claims and expenses that are entitled to be paid on that date. The amount of cash on hand on the effective date of the Plan is expected to be at least $50,000, primarily from accumulated rents and residual savings from prior real estate sales. The anticipated administrative and other claims due on that date will be nominal.

*2. Ability to Make Future Plan Payments And Operate Without Further Reorganization*

    The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments. The Plan Proponent has provided projected detailed financial information in Section III above and will continue to do so in Exhibits A through G.

    The Plan Proponent's financial projections show that the Debtor will be able to pay $590,933 into the Plan, including priority and secured taxes, as well as $200,000 to cover unsecured general debts; there will be approximately $110,315 in unallocated funds that will go to unsecured creditors if not used for administrative and priority expenses. The rental revenue is sufficient to pay all expenses of the estate and, through a salary, Alston's personal expenses. The estate will have at least $50,000 in cash reserves at the start of the Plan to protect against unforeseen circumstances. (See Section III.D.) The final Plan payment is expected to be paid on or about February 1, 2024.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

## V. EFFECT OF CONFIRMATION OF PLAN

### A. Discharge of Debtor

    Discharge. Confirmation of the Plan does not discharge any debt provided for in the Plan until the court grants a discharge on completion of all payments under the Plan, or as otherwise provided in § 1141(d)(5) of the Code. Debtor will not be discharged from any debt excepted from discharge under § 523 of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

### B. Modification of Plan

    The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

    Upon request of the Debtor, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

### C. Final Decree

    Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## VI. OTHER PLAN PROVISIONS

Each Property is essential to the estate, both in its contribution of monthly income to be used to service the secured and unsecured debt as well as its utility to Alston and his family. His elderly relatives live in several of the Properties and would have no other home should he be forced to liquidate.

For additional information, please see attached, as necessary.

_____
Debtor, Alson Alston

Dated: December 3, 2018